UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| HERB LANCASTER, et al. | § | |
| | § | |
| | § | CIVIL ACTION NO. 2:17-CV-00293 |
| v. | § | |
| | § | |
| UTILITY SERVICE CO., INC., et. al. | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE NELVA GONZALES RAMOS, UNITED STATES DISTRICT JUDGE:

NOW COMES UTILITY SERVICE COMPANY, INC. ("USCI"), Defendant in the above entitled and numbered cause, and files this its Motion for Summary Judgment pursuant to and in accordance with Rule 56, Fed. R. Civ. P.; and in support thereof would respectfully show this Honorable Court as follows:

## I.

## PRELIMINARY STATEMENT

A 500,000-gallon elevated water tank stood at 235 East Wilson Ave. in the City of Aransas Pass, Texas ("the City") from its construction in 1955 until its destruction by Hurricane Harvey on August 25, 2017. USCI, pursuant to a contract with the City , performed work on this elevated tank (as well as on two other tanks owned by the City not involved in this action) during the period from 2013 to 2015. Plaintiffs HERB LANCASTER and H. LANCASTER CO., INC. (sometimes jointly referred to herein as "LANCASTER" or as Plaintiffs) then maintained, and still maintain, a place of business close to the location on which the water tower stood.

1

Plaintiffs allege in their First Amended Complaint herein that because USCI and its subcontractor, co-Defendant TANKEZ COATINGS, INC. ("TANKEZ"), performed this work in a negligent manner, the tank collapsed and spilled water which damaged their building and contents and caused disruption of the business. USCI would show that there is no genuine dispute as to any material fact, and it is entitled to judgment as a matter of law within the meaning of Rule 56(a), Fed.R.Civ.P.

## II.

## STATEMENT OF FACTS

*A.    The Contract*

On May 21, 2013, the City and USCI entered into that one certain "Water Tank Maintenance Contract" (hereinafter "the Contract"), a true and correct copy of which is attached hereto as Ex. 1. *See also* Ex.2 (deposition of Kirt Ervin), at 28. By the Contract the parties agreed that USCI would perform certain services on the 500,000-gallon elevated water storage tank located at 235 East Wilson Ave. in the City. Pertinent portions of the Contract include the following:

1.    **Company's Responsibilities.**    This contract outlines the Company's responsibility for the care and maintenance of the above described water storage **tank.  Care and maintenance include the following:**

A. The Company will annually inspect and service the tank.  The tank and tower will be thoroughly inspected to ensure that the structure is in a sound, watertight condition.
B. Biennially, beginning with the first washout/inspection, the tank will be completely drained and cleaned to remove all mud, silt, and other accumulations that might be harmful to the tank or its contents.  After cleaning is completed, the interior will be thoroughly inspected and disinfected prior to returning the tank to service; however, the Owner is responsible for draining and filing the tank and conducting any required testing of the water.  A written report will be mailed to the Owner after each inspection.

2

**Chemical Clean Service.**

1. Biennially, during washout-inspections, the Company will apply an NSF 60 approved chemical cleaning agent to the interior walls and floor surfaces of the Tank to treat mineral build-up and bio-film that form on the interior tank surfaces

2. The Company will fresh water rinse the interior walls and floor surfaces to remove the cleaning agent and to dilute residual concentrations. The Company will also ensure that the rinse water is disposed of in on-site drainage.

3. Thereafter, the Company will complete the washout-inspection as outlined in Article 1-A.

C. The Company shall furnish engineering and inspection services needed to maintain and repair the tank and tower during term of this Contract. The repairs include: steel parts, expansion joints, water level indicators, sway rod adjustments, and manhole covers/gaskets.

. . .

4. **Structure of Tank.** The Company is accepting this tank under program based upon its existing structure and components. *Any modifications to the tank, including antenna installations, shall be approved by Utility Service Co., Inc., prior to installation and may warrant an increase in the annual fee.*

. . .

6. **Excluded Items.** This contract does NOT include the cost for and/or liability on the part of the Company for: (1) containment of the tank at anytime during the term of the Contract, except for the initial renovation; (2) disposal of any hazardous waste materials; (3) resolution of operational problems or structural damage due to cold weather; (4) repair of structural damage due to antenna installations or other attachments for which the tank was not originally designed; (5) resolution of operational problems or repair of structural damage or site damage caused by physical conditions below the surface of the ground; (6) negligent acts of Owner's employees, agents or contractors; (7) damages, whether foreseen or unforeseen, caused by the Owner's use of pressure relief valves; (8) repairs to the foundation of the tank; or (9) other conditions which are beyond the Owner's and Company's control, including, but not limited to: acts of God and acts of terrorism. Acts of terrorism include, but are not limited to, any damage to the tank or tank site which results from unauthorized entry of any kind to the tank site or tank; (10) payment of prevailing wages at anytime throughout the duration of this contract; or (11) repair or replacement of the insulated fill pipe.

. . .

13. **Visual Inspection Disclaimer.** This Contract is based upon a visual inspection of the Tank. The Owner and the Company hereby acknowledge and agree that a visual inspection is intended to assess the condition of the Tank for all

3

patent defects. If latent defects are identified once the tank has been drained for repairs, the Owner agrees and acknowledges that the Company shall not be responsible to repair the latent defects unless the Owner and the Company renegotiate the annual fees. The definition of a "latent defect" shall be any defect of the Tank which is not easily discovered (e.g., corrosion of the floor plates, damage to the roof the tank which is not clearly visible during the visual inspection et.).

(emphasis in the original). The Contract further included the following clause, at section 12 thereof: "This agreement constitutes the entire agreement of the parties and supersedes all prior communications, understandings, and agreement relating to the subject matter hereof, whether oral or written."

B.     *The Work*

USCI retained TANKEZ to perform the actual work of sandblasting, painting and welding related to the tank renovation. In that regard, USCI entered into that one certain master subcontract agreement with TANKEZ, a true and correct copy of which is attached hereto as Ex. 3. That subcontract incorporated by reference the USCI service request ("SR"), a true and correct copy of which is attached hereto as Ex. 4. See also Ex. 2, at 27-28; Ex. 5 (deposition of Antonio Landaverde), at 12.

The SR, by its terms, set forth the items to be accomplished by TANKEZ. Under "Repairs", the SR specified seven tasks, two of which were to "replace top five riser rods" and "replace 3 to 5 wind rods". Ultimately, USCI determined that none of the wind rods required replacement at the time of the renovation. Ex. 6 (deposition of Jimmy Asher), at 133-134.

Pursuant to the Contract, USCI was to conduct annual inspections of the elevated tank. These were done through "condition assessment reports", or CARs, performed by USCI and delivered to the City. The first of these was performed shortly after completion of the initial sandblasting and painting in June 2015; the second was performed in April 2016. True and

correct copies of the CARs are attached hereto as Exs. 7 and 8, respectively. The CAR for 2017 had been tentatively set to take place that autumn, but the tower was destroyed prior to that time when Hurricane Harvey made landfall. Ex. 6, at 68.

C.    *The Lawsuit*

On September 12, 2017 Plaintiff HERB LANCASTER individually filed suit against USCI, claiming negligence in USCI's work on the elevated tank which ultimately resulted in the collapse of the tank on or about August 25, 2017 and damage to his building and business, as well as mental anguish. Plaintiff's Original Complaint (Doc. 1). Plaintiff later amended his complaint to add H. LANCASTER COMPANY – the owner of the business and of certain tangible assets of the business (excluding the building) -- as a Plaintiff. Plaintiffs' First Amended Complaint (Doc. 21). In addition, Plaintiffs added TANKEZ as a defendant, alleging negligence and gross negligence against both companies. Both Defendants answered the First Amended Complaint. Defendant's First Amended Original Answer (Doc. 24); Defendant TankEZ Coatings, Inc.'s Original Answer (Doc. 28).

As of the date of this filing all liability expert reports have been exchanged and all liability experts designated by the parties have been deposed (save for Mr. Paul Williams, Plaintiffs' expert and co-author of Plaintiffs' liability expert report, whose deposition had to be postponed due to his illness).

## III.

## GROUNDS OF SUMMARY JUDGMENT

On the pleadings and by the undisputed material facts developed through discovery, USCI owed no duty to Plaintiffs or either of them, and thus could not have breached a duty, in connection with its performance of its obligations under the Contract with the City . This is so in

that Plaintiffs were not parties to the Contract, were not beneficiaries of the Contract, and as a matter of law no statute or principle of the common law recognized in Texas – including § 324A of the Restatement (Second) of Torts – permits the imposition of liability on USCI in connection with its work under the Contract.

Further, USCI would show that there is no competent and admissible evidence to demonstrate the element of proximate cause. This is so in two respects: (1) there is no reliable expert testimony, within the meaning of Rule 702 et seq., Fed.R.Evid., that any act or omission of USCI caused the collapse of the elevated tank; and (2) there is likewise no reliable expert testimony that the collapse and rupture of the tank itself caused damage to Plaintiffs' property.

Finally, and in the alternative, USCI would show that with respect to Plaintiff HERB LANCASTER's claim for mental anguish damages, such damages as a matter of law are not recoverable under the undisputed material facts.

The following arguments and authorities are likewise incorporated into the foregoing grounds of summary judgment.

## IV.

## ARGUMENT AND AUTHORITIES

### A.    The Legal Standard

Summary judgment is appropriate under Rule 56 if the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment should be entered if the party bearing the burden of proof at trial

"fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.*, at 323.

The U.S. Fifth Circuit Court of Appeals summarized the summary judgment standard aptly in *Rogers v. Bromac Title Services, LLC*, 755 F.3d 347 (5th Cir. 2014) as follows:

> We review a district court's grant of summary judgment de novo, applying the same standard on appeal as that applied below. *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1985). "[T]his court construes 'all facts and inferences in the light most favorable to the nonmoving party.' " *McFaul v. Valenzuela*, 684 F.3d 564, 571 (6th Cir. 2012) (quoting *Dillon v. Roberts*, 596 F.3d 260 266 (5th Cir.2010)). But "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions or presentation of only a scintilla of evidence." *Id.*

> "We are not limited to the district court's reasons for its grant of summary judgment and may affirm the district court's summary judgment on any ground raised below and supported by the record." *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 606-07 (5th Cir.2014) (internal quotation marks omitted).

*Rogers,* at 350.

This is a diversity action in which Texas law applies. *Poyner v. Mitsubishi Power Systems Americas, Inc.*, 482 Fed. Appx. 887, 888 (5th Cir. 2012).

B.     *Existence of Duty*

Texas law – like that of most jurisdictions – generally restricts the enforcement of contract rights to the actual parties to a contract. Under certain limited circumstances a stranger to the contract might seek to claim the benefits or enforce the obligations thereof as a "third-party beneficiary."

However, less than two years ago the Texas Supreme Court in *First Bank v. Brumitt,* 519 S.W.3d 95 (Tex. 2017) reiterated succinctly and well the rule on third-party beneficiary status, and the presumption against same:

> To determine whether the contracting parties intended to directly benefit a third party and entered into the contract for that purpose, courts must look solely to the contract's language, construed as a whole. *Southland Royalty Co. v. Pan Am. Petroleum Corp.,* 378 S.W.2d 50, 53 (Tex. 1964); *Citizens Nat'l Bank in Abilene v. Tex. & P. Ry. Co.,* 136 Tex. 333, 150 S.W.2d 1003, 1006 (1941). The contract must include "a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party," and any implied intent to create a third-party beneficiary is insufficient. *Tawes v. Barnes,* 340 S.W.3d 419 (Tex. 2011); *see also Stine* [*v. Stewart*], 80 S.W.3d at 589; *MCI* [*v. Texas Utils. Elec. Corp.*], 995 S.W. 2d at 651; *Citizens Nat'l Bank,* 150 S.W.2d at 1006. Courts may not presume the necessary intent. To the contrary, "we must begin with the presumption" that the parties contracted solely "for themselves," and only a clear expression of the intent to create a third-party beneficiary can overcome that presumption. *Corpus Christi* [*Bank & Trust v. Smith*], 525 S.W.2d at 503-04.

*First Bank,* at 102 – 103. It is simply "not enough that the third-party would benefit – whether directly or indirectly – from the parties' performance, or that the parties knew that the third-party would benefit." *Id.,* at 102. Plaintiffs cannot claim to be third-party beneficiaries here (nor does it appear they have tried to do so, since they have not pled such a theory).

Neither have Plaintiffs pled § 324A of the Restatement (Second) of Torts – but there does not appear to be any other theory on which they might attempt to rely in the assertion of this purely common-law claim of negligence.

The section provides in its entirety as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> > (a) his failure to exercise reasonable care increases the risk of such harm, or

      (b) he has undertaken to perform a duty owed by the other to
          the third person, or

      (c) the harm is suffered because of reliance of the other or the
          third person upon the undertaking.

Thus the injured plaintiff must establish, first, that the defendant undertook to render services to another *which the defendant should have recognized as necessary for the protection of a third person or his things;* only if that threshold predicate is met – together with, of course, a "failure to exercise reasonable care" – do we then proceed to analyze whether the plaintiff is able to meet one of the three alternative predicates to liability. *Lowe's Home Centers, Inc. v. GSW Marketing, Inc.*, 293 S.W.3d 283, 291 (Tex. App. – Houston [14th Dist.] 2009, pet. denied).[1]

It is important to bear in mind that § 324A "imposes a duty to perform without negligence only the task that the actor has undertaken to accomplish. Although this rule expands the class of persons to whom the duty of care is owed, it does not expand the scope of the undertaking." *Lowe's, supra.* Here there is no evidence that USCI undertook to perform a task which it should have recognized as "necessary for the protection of a third person or his things"– certainly not in the context of Plaintiffs' claims. Plaintiffs argue that because USCI performed its duties negligently, an elevated tank which would otherwise have been able to withstand the forces of Hurricane Harvey was brought down, resulting in damage to Plaintiffs' property. But this refers to a task which USCI not only did not agree to perform, but as to which it specifically and expressly disclaimed performance in its contract. Again, § 6 of the contract – "Excluded Items"– expressly provides that the Contract "does NOT include the cost for and/or liability on

---

[1] In at least one case the Fifth Circuit recognized the three enumerated alternative circumstances as pertaining to proximate cause rather than, strictly speaking, the existence of a duty. *See,* e.g., *Patentas v. United States*, 687 F.2d 707, 716 (5th Cir. 1982). In any event, one of these three circumstances must be shown to apply before liability can attach.

the part of the Company for: . . .(9) other conditions which are beyond the Owner's and Company's control, including, but not limited to: acts of God..." (emphasis in the original).

In other words, the City was not being charged for repair or renovation of an elevated tank to a condition in which it would withstand a hurricane; USCI disclaimed any obligation to service the elevated tank in such a manner that it would withstand a hurricane; and USCI expressly disclaimed any liability should a hurricane bring down the tank. There is not an expert involved in this case who has opined, suggested, or hinted that the Wilson Ave. tank and tower would have collapsed under its own weight, beneath a clear blue sky, had Hurricane Harvey not made landfall on or near it. The scope of work undertaken by USCI simply did not include protection of the elevated tank, or anyone or anything near the elevated tank, *against the very risk giving rise to this action*. This properly ends the inquiry under § 324A.[2]

Even aside from that predicate, however, Plaintiffs cannot satisfy any of the three alternative conditions necessary for liability under § 324A. As to subsection (a), there is of course not even the slightest scintilla of evidence that any act or omission of USCI (or, for that matter of TANKEZ) resulted in an *increase* of risk of any harm to Plaintiffs. To satisfy the requirement of subsection (a) a plaintiff must how that the defendant's negligence created a worse condition than if it had never undertaken the activity in the first place. *City of Denton v. Page*, 701 S.W.2d 831, 836 (Tex. 1986) (Kilgarlen, J., concurring); *see also Canipe v. National Loss Control Service Corporation*, 736 F.2d 1055, 1062 (5th Cir.1984) ("This subsection

---

[2] There should be no legitimate dispute, of cause, that a category 3 hurricane qualifies as an "act of God" in the legal sense, but still it is worth pointing out that the U.S. Southern District of Texas has recognized Hurricane Harvey as such. *Jeffersson v. Haza Foods*, 2018 WL 5268756 (S.D. Tex. 2018), at * 5 ("It is the Court's firm belief that if Hurricane Harvey and Jefferson's resulting displacement do not constitute extraordinary circumstances, then nothing does", citing with approval to *Carlisle v. United States*, 517 U.S. 416, 436 (1996) (Ginsburg, J., concurring) (suggesting that untimely filing of a meritorious motion might be excused due to an "act of God")).

[324A(a)] requires some change in conditions that increases the risk of harm to the plaintiff over the level of risk that existed before the defendant became involved.").

Subsections (b) and (c), which are somewhat related, involve situations in which the defendant "has undertaken to perform a duty owed by the other to the third person [plaintiff]", or where "the harm is suffered because of reliance of the other or the third person upon the undertaking." For much the same reason discussed above, and as recognized in *Lowe's, supra*, there has been no delegation by the City to USCI to undertake to protect Plaintiffs (or the public at large) from the risk involved here – nor could the City *or* Plaintiffs have "relied" on USCI, given the unambiguous terms of the force majeure clause contained in the Contract, to protect against the risk involved here.[3] In fact, the cases involving subsections (b) and (c) tend for the most part to arise in an employment context, in which a contractor is retained to perform some safety related task or inspection service; typically, though, the employer retains its duty to provide a safe workplace for its employees. *See, e.g., Kuentz v. Cole Systems Group, Inc.*, 541 S.W.3d 208, 218 (Tex. App. – Houston [14th Dist.] 2017, no pet.).

Particularly pertinent to our case is *Knife River Corporation – South v. Hinojosa*, 438 S.W.3d 625 (Tex. App. – Houston [1st Dist.] 2014, pet. denied). There the Texas Department of Transportation ("TxDOT") entered into a contract in which Knife River was to perform a resurfacing project. Some five years after the project was completed, a driver, Hinojosa, suffered a fatal motor vehicle accident when he lost control of his vehicle due to a steep drop-off on the shoulder of the road. That drop-off involved a box culvert on the shoulder which pre-dated the project; Knife River's contract required that it not permit any drop-offs exceeding a three to one

---

[3] Indeed, Plaintiffs did not rely on USCI for anything: as HERB LANCASTER testified in his deposition, he had never heard of USCI prior to Hurricane Harvey. Ex. 9 (deposition of Herb Lancaster), at 103-105. See, e.g., *Davis v. Liberty Mutual Insurance Company*, 525 F2d 1204, 1208 (5th Cir. 1976).

ratio on its backfill work. The evidence indicated that extending the box culvert and filling that particular drop-off would have required a change order from TxDOT. *Knife River*, at 628, 629 – 630. Hinojosa's survivors sued Knife River claiming that it had undertaken a duty not to leave a drop-off with a greater than three to one ratio, as well as a duty to send written notice to TxDOT regarding the drop-off. A jury assigned negligence to both Knife River and TxDOT, but the trial court disregarded the findings as to TxDOT and assessed all liability against Knife River, with damages totaling just under $5,000,000. The finding in negligence as to Knife River was pursuant to 324A of the Restatement, by way of a negligent undertaking. *Id.*, at 630.

The appellate court reversed and rendered a take-nothing judgment. The court recognized that liability under §324A can result either from the defendant negligently increasing the risk or from the defendant's negligent undertaking of the duty owed by the other to the third party. The court observed that there was no evidence that Knife River's services increased any risk to motorists. As to negligent undertaking, the court observed that "the critical inquiry concerning the duty element of a negligent undertaking theory is whether a defendant *acted in a way* that requires the imposition of a duty where one otherwise would not exist." *Id.*, at 634 (emphasis in the original).

Two of the issues analyzed by the court are especially important. First, the plaintiff had argued that certain TxDOT specifications incorporated by reference in the project plans called for a TxDOT engineer to be notified in writing when differing site conditions of an unusual nature were encountered, in which case work would be suspended until the engineer could investigate; adjustments would then be made to the contract in accordance with any additional work required. *Id.*, at 636-637. The court observed that nothing in that section indicated

12

that the purpose of providing written notice to TxDOT was to address safety issues. Nor does it indicate that the provision was for the benefit or protection of third parties. Rather, from its language, the notice provision is designed to address compensation issues and to provide a means by which a TxDOT contractor may obtain additional compensation for work undertaken to complete a project. . .

*Id.*, at 637.

Second, the court delineated – as in *Lowe's, supra* – the outer perimeter of negligent undertaking liability:

We also note that courts in other jurisdictions have recognized that for liability to be imposed under §324A(b), a party "must completely assume a duty owed by (another) to (the third person)." *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1156 (11th Cir. 1993); *see also Ironwood Springs Christian Ranch, Inc. v. Walk to Emmaus,* 801 N.W.2d 193, 202 (Minn.Ct.App.2011) (stating that, "to impose liability under §324A(b), one who undertakes a duty owed by another to a third person must completely assume the duty"); *Plank v. Union Elec. Co.,* 899 S.W.2d 129, 131 (Mo.Ct.App.1995)(concluding that "one must intend to completely subsume or supplant the duty of the other party in order to incur liability for nonperformance of that duty"); *Obenauer v. Liberty Mut. Ins. Co.,* 908 F.2d 316, 317 (8th Cir. 1990) (concluding that an insurer providing safety services to a manufacturer was not liable under §324A to the user of a manufactured product because the insurer did not "replace" the manufacturer's duty to design a safe product); *Furek v. Univ. of Del.,* 594 A.2d 506, 515–16 (Del. 1991) (recognizing that §324A "applies only when one undertakes to supplant the duty of another owed to a third person"); *Davis v. Liberty Mut. Ins. Co.,* 525 F.2d 1204, 1207-08 (5th Cir. 1976) (requiring that party with original duty completely "delegate[]" the duty to the undertaking party for the undertaking party to be liable under subsection (b)). Here, the evidence showed that TxDOT was responsible for the maintenance and safety of Texas roads, including the highway where the accident occurred. Even though Knife River contracted to provide backfill services incidental to the overlay work, no evidence showed that TxDOT relinquished its duty to maintain the road's safety when it entered into the overlay contract with Knife River. TxDOT retained that duty.

*Id.*, at 63.

Concluding that §324A imposes a duty to perform without negligence "only the tasks that the actor has undertaken to accomplish, Knife River owed no duty – as a matter of law – to

rectify the drop-off or to provide written notice regarding the defect [citing *Lowe's Home Centers, supra*]." *Id.*, at 637.

The last paragraph of the Contract here – paragraph 13, dealing with patent and latent defects (quoted hereinabove) – is very much analogous to the discussion of written notification in *Knife River*. This is significant in that the "visual inspection disclaimer" of the Contract specifically prescribed that "[i]f latent defects are identified once the tank has been drained for repairs, the owner agrees and acknowledges that the Company shall not be responsible for repair for latent defects unless the Owner and the Company renegotiate the annual fees. . ." Like the TxDOT specifications as to written notice in *Knife River*, this clause does no more than provide a means by which USCI could obtain "additional compensation for work undertaken to complete a project" - it was not a provision "for the benefit or protection of third parties." *Id.* To the extent Plaintiffs claim the ability of the elevated tank to withstand Hurricane Harvey required the correction of any defect which a pre-sandblasting visual inspection would not have disclosed, this would have involved a change order which USCI was under no obligation to seek or pursue.

Moreover, and more broadly, if, as and to the extent the City owed Plaintiffs a duty not to allow a falling water tower to damage their property or business, it seems clear that that duty was not delegated either in whole or in part to USCI. As discussed, the Contract includes an express force majeure clause – not only did USCI not expressly agree to provide the City with a hurricane-proof tower, it specified in writing that it did *not* agree to provide the City with a hurricane-proof tower. Ex. 1 ("This contract does NOT include *the cost for* and/or liability on the part of the Company for. . .acts of God. . .") (italics added). There does not exist a theory under which USCI could have owed Plaintiffs a greater duty with regard to the structural integrity of the tower than it owed the City.

14

Also important to bear in mind is that, in analyzing the duty element of a § 324A claim, when parties have specifically agreed to the written terms of a contract, a defendant's promotional material or other general and broad descriptions of the nature of its services cannot replace the actual undertaking. *Kuentz, supra,* at 218.

Indeed, just last week the Supreme Court of Texas reiterated this same principle, albeit in a different context, in the case of *Mercedes Benz U.S.A., LLC v. Carduco, Inc.,* ___S.W.3d _____, 2019 WL 847845 (Tex. 2019), rejecting a claim of fraudulent inducement "on the ground that a party cannot justifiably rely on a misrepresentation that directly conflicts with the terms of the signed contract." *Carduco,* at *5. Citing with approval to the case of *DRC Parts and Accessories, LLC v. VM Motori, SPA,* 112 S.W.3d 854 (Tex. App. – Houston [14th Dist.] 2003, pet. denied), the Court observed as follows:

> Because such an approach would defeat the ability of written contracts to provide certainty and avoid dispute, the prevailing rule, recited above, is instead that a party who enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract.

*Id.* (quoting *DRC, supra* at 859).

In view of the foregoing, Plaintiffs as a matter of law are unable to make a *prima facie* showing of liability under § 324A. That section is intended to apply only in unusual circumstances, and such liability is the exception – not the rule. Again, there being no other basis on which liability in negligence can be predicated, USCI is entitled to summary judgment.

C.   *Causation*

While Plaintiffs managed to avoid any reference to Hurricane Harvey in their pleadings, they retained and designated expert witnesses to discuss the liability issues of the case, including

15

the impact of that hurricane. Mr. Travis Wells, P.E., of Haag Engineering – a mechanical engineer – was so designated and he was deposed on February 8, 2019.

Mr. Wells testified that in his opinion the elevated tank would have been able to withstand the forces of Hurricane Harvey had the work under the Contract been done in accordance with certain standards promulgated by the American Water Works Association (AWWA), specifically pertaining to maintenance or replacement of certain connecting rods. In particular Mr. Wells pointed to "wind rods" or "sway rods", which are designed to function in such a manner as to stabilize an elevated tank during high winds and thus to minimize the "sway" of the tank. Ex. 10 (Deposition of Travis Wells, P.E.), at 155. There were a total of 64 of these wind rods located on the tower; Mr. Wells notes a pre-bid inspection in which USCI indicated that it proposed to replace three to five wind rods, according to need, but that USCI ultimately did not replace any of the wind rods in the course of the work. *Id.*, at 157.

Mr. Wells testified that he was provided, during the late spring or early summer of 2018 (some nine or ten months after the passage of Hurricane Harvey), a total of seven wind rods that had been retrieved from the debris of the tower collapse the previous fall; these were provided to Haag Engineering by Mr. West, counsel for Plaintiffs. Of the seven, Mr. Wells was of the opinion that six should have been replaced in the course of the work done on the elevated tank. He also reviewed a number of photographs of tower parts that had been provided to him by Mr. West, from which Mr. Wells was able to discern "maybe another five or so" that appeared suspect to him, for a total of about eleven wind rods. He did not ask to see, was not shown, and has no information concerning the state of the other 53 wind rods on the tower immediately prior to the storm. *Id.*, at 210-211.

Mr. Wells was unable to say how many of the tower's 64 wind rods would need to have been replaced in order for it to withstand the hurricane; he complained that USCI had not done a proper job of documenting its work regarding the wind rods, but nonetheless could not give an answer. He confirmed this, in express terms, thusly:

> Q. [by Mr. Waters]. You don't know how many wind rods would have needed to be replaced if – in order to avoid the tower coming down, right?
>
> A. [by Mr. Wells]. I can't say. I don't have that information.

*Id.*, at 154. He did insist, though, that "the wind rods were the problem." *Id.*, at 155.

In reality, and as his deposition testimony demonstrates, Mr. Wells is unable to say how many wind rods would have to be replaced to make this elevated tank wind-proof against Hurricane Harvey, even assuming that could be done. Certainly, he comes nowhere close to being able to say that replacement of the only eleven wind rods of which he has made any observation of any kind, or of which he has any knowledge, would have been sufficient. Since wind rods were the problem in his view, he has no sound basis – and can offer no expert testimony within the meaning of Rules 702 and 703 – to the effect that any act or omission of USCI proximately caused the collapse of the tower, and thus there is no evidence within the meaning of Rule 56 in support of that component of causation.

But that was not the only causation hurdle Plaintiffs would have had to clear in this case. Let us briefly consider the second: whether the collapse of the elevated tank, in the midst of Hurricane Harvey's winds and storm surge, actually caused the damage to Plaintiffs' property.

Mr. Wells and his co-author in the Haag Engineering expert report, Mr. Paul R. Williams, P.E., devoted exactly one sentence of that report – in a paragraph headed "Background Information" – to the issue of the relationship, if any, between the collapse of the tank and the damage to the Lancaster building: "Water spilt from the collapsed tank and damaged nearby

17

structures, including the place of business owned by Mr. Herb Lancaster." Ex. 11 (excerpt from Wells/Williams report).   There was nothing else – no analysis of the effect of Hurricane Harvey's winds on the building, no inquiry into the effect of the storm surge in the area, no calculations, nothing but a bare conclusion.  The report was produced on November 2, 2018, the last day for Plaintiffs' designation of experts.

Later, in Plaintiffs' Response in Opposition to TANKEZ's Motion for Summary Judgment/Motion to Dismiss (Doc. 48), Plaintiffs proffered an affidavit signed by Mr. Wells as an exhibit to the Response.  In this affidavit, Mr. Wells stated as follows:

> Mr. Williams and I personally inspected the site of the water tower collapse.  I personally witnessed areas of damage to the Lancaster building and property that were definitely caused by water tower components and water contained within the tower at the time of collapse.  This damage included ripped out building panels and building support beams twisted and ripped from the slab.

Ex. 12, at 2.   Once again there is no explanation or analysis of how the force of the water said to have come from the tank, as distinct from hurricane force winds and storm surge, caused or contributed to cause damage to the property.

At his deposition, Mr. Wells freely conceded that he did not know how much water was in the tank at the time of the collapse, did not know what procedures or protocols were maintained by the City  with regard to the draining of elevated tanks in anticipation of serious storms (or whether such procedures or protocols exist), and had made no attempt to gather information about any of this.  Ex. 10, at 78-79.  He freely conceded that he made no measurement of the size of the storm surge or the wind velocity that was driving the storm surge water against the building, and has no knowledge of what those forces were.  *Id.*, at 231 – 232. He stated generally that storm surge, and wave action caused by a storm surge, "is a wide global

event, covers a long area", and that he would expect that "if a storm surge came in there in wave action, then it would have hit all of that building" rather than for it to be "localized in exactly the area where the water spilled from the tower would have come from." *Id.*, at 233. (That is a highly curious observation, given that he stated in his report that water from the tower damaged not only Plaintiffs' building but "other structures in the area.")  Although he had no idea how much water from the tank came through "the area where the water spilled from the tower would have come from", and no idea how much storm surge water was there, and no idea how the amount of tank water compared to the amount of storm water driven by the hurricane, and he did no calculations, still there was "absolutely no doubt in [his] mind that [it] was caused by water spilt from the water tower." *Id.*, at 233 – 234.

It is of course axiomatic – and the U.S. Fifth Circuit has repeatedly recognized – that "a claim cannot stand or fall on the mere ipse dixit of a credentialed witness", and that in reviewing expert opinion evidence, "we look to the basis of the expert's opinion, and not the bare opinion alone." *McManaway v. KBR, Inc.*, 852 F3d 444, 449 (5th. Cir. 2017) (quoting, *inter alia, Wackman v. Rubsamen*, 602 F.3d 391, 400 (5th. Cir. 2010)).  Both of those opinions quote *Guile v. United States,* 422 F.3d 221, 227 (5th. Cir. 2005) for the proposition that "evidence sufficient to support a jury verdict must be *substantial* evidence. . . An expert's opinion must be supported to provide substantial evidence. . ." (citation omitted) (emphasis in the original).  In this case, in *both* aspects of causation, Mr. Wells has proffered nothing more than his own unsupported bare conclusions – but this is most glaringly (and fatally) so in regard to the second aspect, dealing with property damage.  Once again, USCI is conclusively entitled to summary judgment.

D.      *Mental Anguish*

HERB LANCASTER sustained no bodily injury, and brings no bodily injury claim, in connection with the damage to his building; like most residents of the City , he heeded official evacuation warnings and was in Cuero, Texas when the storm passed through and the tower collapsed. Ex. 9, at 43.

The general rule, which has been the law in Texas for more than two decades, is that a common law cause of action for negligent damage to property will support damages for mental anguish only where the damage is accompanied by bodily injury, subject to very few exceptions. "Without intent or malice on the defendant's part, serious bodily injury to the plaintiff, or a special relationship between the two parties, we permit recovery for mental anguish in only a few types of cases involving injuries of such a shocking and disturbing nature that mental anguish is a highly foreseeable result." *City of Tyler v. Likes*, 962 S.W.2d 489, 496 (Tex. 1997).  Those "few types of cases" typically include actions for wrongful death and actions by bystanders for a close family member's serious injury. *Id.*

To be sure, certain statutory causes of action in Texas – e.g., under the Deceptive Trade Practices Act – expressly permit recovery of mental anguish damages, and a breach of fiduciary duty invades the kind of "special relationship" mentioned in *Likes, supra.* Nothing of that sort, however, is involved here.

Obviously, Plaintiffs have not plead – nor could they have plead – a claim for breach of fiduciary duty, fraud, violations of the DTPA, or any other cause of action that would imply some transactional relationship between them and USCI.  Again, HERB LANCASTER had never heard of USCI prior to Hurricane Harvey, and Plaintiffs' claims sound only in negligence.

If, as and to the extent HERB LANCASTER attempts to rely on a claim of gross negligence to support a claim of mental anguish for property damage, this too is of cold comfort. Aside from the substantively meritless claim of gross negligence itself in this case, the law in Texas has been clearly stated on this point: "Where a claim of mental anguish is based solely on property damage resulting from gross negligence, recovery is contingent on evidence of some ill will, animus, or design to harm the plaintiff personally; such rationale is more consistent with the general principle that emotional distress is not usually recoverable as an element of property damages unless there is an improper motive involved." *NBR and Associates, Inc. v. Lile*, 2012 WL 4661665 (Tex. App. – Ft. Worth 2012, pet. denied), at *8. To like effect is *Seminole Pipeline Company v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 757 (Tex. App. Houston [14th Dist.] 1998, no pet.) (disallowing mental damages in a gross negligence case involving an explosion at a natural gas liquids reservoir, in which certain plaintiffs sustained property damage but no bodily injury).

HERB LANCASTER was clear on this point in his deposition:

Q.    [by Mr. Waters]:  Now let me ask you this: before Hurricane Harvey came thru, did you know anything about USCI, Utility Service Company?

A.    [by Mr. Lancaster]:  No.

Q.    Had you ever even heard of them?

A.    No.

. . .

Q.          Okay.  Same question with regard to TankEZ, which was a subcontractor involved in that sandblasting and painting.  Had you ever heard of TankEZ –

A.    No.

Q.    - before the storm?  OK.  Did you know any of TankEZ's people –

A.     No.

. . .

Q.     . . . You don't have any reason to believe, do you, Mr. Lancaster, that when USCI was out at the site in 2013, '14, '15 timeframe. . . you don't have any reason to believe when USCI was out at the site or when TankEZ was out at the site that anybody connected with those companies bore you any particular ill will, correct?

A.     Correct.

Q.     You have no reason to believe that any of them bore H. Lancaster Company any ill will, correct?

A.     Correct.

Ex. 5, at103-105.

As a matter of law, HERB LANCASTER has no valid claim for mental anguish damages in this case.

## V.
## CONCLUSION

In sum, USCI is conclusively entitled to summary judgment on Plaintiffs' claims, in their entirety, on either of two separate and sufficient grounds:  the non-existence of a duty owed by USCI to Plaintiffs, under any theory of Texas law, on the causes of action alleged; and the absence of any reliable and admissible expert evidence on causation as discussed.  In addition, and subject to and without waiving the foregoing, USCI is conclusively entitled as a matter of law to a partial summary judgment on the claim of HERB LANCASTER for mental anguish damages.

While USCI reserves the right to file other expert-related motions within the deadlines established by order of this Honorable Court, the instant motion is entirely sufficient to support a take-nothing judgment in favor of USCI under Rule 56, Fed. R. Civ. P.

WHEREFORE, PREMISES CONSIDERED, USCI respectfully prays that this Motion for Summary Judgment be in all respects granted; and for such other and further relief, at law or in equity, to which USCI might show itself justly entitled.

Respectfully submitted,

**THORNTON, BIECHLIN,
REYNOLDS & GUERRA, L.C.**

One International Centre
100 N.E. Loop 410, Suite 500
San Antonio, TX 78216-4741
Telephone: (210) 342-5555
Facsimile: (210) 525-0666

BY: _____
Vaughan Waters
State Bar No. 20916700
E-mail: vwaters@thorntonfirm.com
**ATTORNEYS FOR
UTILITY SERVICE CO., INC.**

23

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Federal Rules of Civil Procedure 5(b)(1) and Local Rule 5.3, on this 27th day of February, 2019.

S. Scott West
The West Law Firm
1600 Highway Six, Suite 450
Sugar Land, Texas 77478
*Attorneys for Plaintiff, Herb Lancaster*

Bryan Wendt
Burt Barr & Associates
203 E. Colorado
Dallas, Texas 75203
*Attorneys for Defendant, TankEZ Coatings, Inc.*

Vaughan E. Waters