# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **HERB LANCASTER, ET AL.** | § | **CIVIL ACTION NO. 2:17-CV-00293** |
| | § | |
| **V.** | § | |
| | § | |
| **UTILITY SERVICE CO., INC., ET AL.** | § | **JURY DEMANDED** |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## USCI'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs file this response to the Motion for Summary Judgment filed by Defendant Utility Service Co., Inc. (USCI) (Doc. 55).  In its motion, USCI asserts three grounds for summary judgment.  First, it alleges USCI owed no duty to Plaintiffs.  Second, it contends Plaintiffs have no evidence of proximate cause.  And third, it alleges Herb Lancaster cannot recover mental anguish damages.  Because USCI misapprehends the law, and because fact issues remain for trial, USCI's Motion for Summary Judgment should be denied.

## I.    Statement of Facts Precluding Summary Judgment.

The City of Aransas Pass's 500,000 gallon 140 foot high elevated water tower on East Wilson Avenue was constructed in the mid-1950s. (*See* Exh "G", Rule 26 Report, p. 3).  By 2013, The tower was in a dilapidated condition because it had not been properly maintained, and had not been renovated in many years. (*See* Exh "A", pp. 11 – 14).

On May 20, 2013, USCI sent its salesman (Paul Jette), its Director of Sales for the Western Region[1] (John Snodgrass), and one of its engineers (Kirt Ervin)[2] to meet with the

---

[1] USCI's "Western Region" included Texas under its then-new restructuring of geographical responsibilities.
[2] Kirt Ervin also was USCI's designated Corporate Representative for a FRCP 30(b)(6) deposition in this case.

Aransas Pass City Council. A transcript of USCI's presentation is attached as Exhibit "A" (see, also, Exh "H"—Business Records Affidavit of Mary Juarez).

By May 2013, the City had already approved a $2,000,000 bond sale for the express purpose of replacing the elevated water tower. (Exh "A", p. 2). But USCI told the City it was unnecessary to replace the water tower because there was not anything wrong with the water tower "from a structural standpoint," and USCI could repair and maintain the water tower in compliance with American Water Works Association (AWWA) standards. (Exh "A", pp. 18 – 19, 22, 23 – 24).

USCI proposed the City enter its "Full Service Asset Management Program." Under this Asset Management Program, USCI promised that the City would able to turn over the responsibilities of all of its water tanks to USCI. The focus was shifting from "reactionary maintenance" to "proactive maintenance". More specifically, USCI promised the City "[if] we can protect the steel and not allow that to be sacrificed, a water tower will literally last forever it it's proactively maintained." (Exh "A", p. 5 – 7).

USCI said over 2,000 other cities had hired USCI to maintain their water tanks under this "Full Service Asset Management Program." (Exh "A", p. 9). USCI told the City it had over 100 crews at its disposal, so whether the tanks needed renovation, cleaning, or inspection, or even in the event of an emergency, under the Program the tanks are taken care of with no additional costs—it was all included in the Asset Management Program. (Exh "A", p. 10).

The USCI team established its credibility with the City by noting that USCI was founded in 1963, and was the largest provider of contract water tank maintenance in the

United States of America. (Exh "A", p. 4). Additionally, USCI had over 750 employees in 10 service centers, and covered about 85 percent of the continental United States. (Exh "A", p. 4). Further, each year USCI inspected over 8,000 tanks, painted 1,400 tanks, and maintained over 5,000 tanks in its Asset Management Program. (Exh "A", p. 4).

According to the USCI team, the City was better off rehabilitating the elevated water tower than replacing it. USCI said it "is a company that has -- since the 1960's has taken care of water storage tanks. [USCI has] been both in the rehabilitation side of the business and [also] worked on the new -- building of new tanks, too. One of the things that [USCI] typically will find is it's almost always a better fit to be able to rehab a tank[.]" (Exh "A", p. 3). And USCI assured the City it had determined the typical situation was also "the case in your situation." *Id*.

USCI further promised the City that "[it would] also have single source responsibility. Once we have a contract signed on that tank, when we go and paint the tank, we repair the tank, we do any of the work on the tank, we are going to stand behind it for the perpetual, for the full service life of the coating system. Same thing with any of the repairs. And so having that single source responsibility is something that most of our communities, they really find that as a very useful thing because when we come to paint the tank, when we come to repair the tank, when we come to inspect the tank, we're looking at it like we own the tank. As a result of having to stand behind it, we know that, you know, doing things halfway doesn't benefit either one of us." (Exh "A", p. 18).

USCI summed up the benefits of its Full Service Asset Management Program: "We're going to do a full renovation on each one of the tanks in the first year of the program

**Page 3**

there. But ultimately what we're going to do is that because of the bond and because of the way you're going about with the funding, we are going to go ahead and you are going to pay for this full renovation on each of these in the first year. The best thing is they you will have no more payments for the next five years." (Exh "A", pp. 18 – 19).

USCI literally talked the City out of replacing its elevated water tower, and into its Full Service Asset Management Program. (Exh "A", p. 22). Indeed, USCI told the City: "We're saying we can rehab this elevated tank where you may have had somebody told you that you need to replace it. We're confident enough that we can rehab the tank that, again, we're not only willing to perform the job but we are willing to stand behind it. We feel very confident that from a structural standpoint, that there's really not anything wrong with that tank." (Exh "A", p. 22).

On May 21, 2013, the City entered the multi-year, Full Service Asset Management contract with USCI to renovate and maintain its elevated water tower for ten years—the first five years of which were pre-paid.[3] (Exh "B", p. 3).

> 2.   **Contract Price/Annual Fees.**   The tank shall receive an **exterior renovation, interior wet renovation, and repairs** prior to the end of Contract **Year 1**. The annual fee for Contract **Year 1** shall be **$567,535.00**. The annual fee for Contract **Year 6** and each subsequent annual fee shall be **$29,831.00** per Contract Year; however, in Contract **Year 9** and each third anniversary thereafter, the annual fee shall be adjusted to reflect the current cost of service. The adjustment of the annual fee shall be limited to a

The collapse of the water tower occurred August 25, 2017, during the term of the contract. (*See* Exh "B").

---

[3] The City of Aransas Pass entered separate similar contracts with USCI for the two (2) ground storage tanks.

63757_1

**USCI's Contract Obligations.** Under the contract USCI was obligated to thoroughly inspect the tank and tower structure to ensure the structure was in a sound condition. (Exh "B", p. 2):

> 1.   **Company's Responsibilities.** This Contract outlines the Company's responsibility for the care and maintenance of the above described water storage tank. Care and maintenance include the following:
>
>    A. The Company will annually inspect and service the tank. The tank and tower will be thoroughly inspected to ensure that the structure is in a sound, watertight condition.

USCI also was obligated to furnish engineering and inspection services needed to maintain and repair the tank and tower during the term of the contract. The repairs included sway rod (wind rod) adjustment and steel parts. (Exh "B", p. 3):

> C. The Company shall furnish engineering and inspection services needed to maintain and repair the tank and tower during the term of this Contract. The repairs include: steel parts, expansion joints, water level indicators, sway rod adjustments, and manhole covers/gaskets.

**USCI Representative Testimony.** USCI's Job Supervisor and Service Center Manager, **Jimmy Asher**, testified (depo page references in parentheses):

- USCI's contract with the City included the tower structure, including wind rods (pp. 66 – 67)
- USCI determined and controlled which structural members were to be replaced (pp. 42 – 43)
- USCI was responsible for how structural members were replaced (pp. 42 – 43)
- USCI made the decision on which wind rods were replaced (p. 26)
- USCI ultimately was in charge of and responsible for the project (p. 41)
- If the Jury determines certain structural members should have been replaced, but weren't, that responsibility falls on USCI (p. 43)
- No wind rods were replaced (pp. 133 – 134)

**Other Evidence of USCI's responsibility to maintain, repair and replace wind rods.** Additional evidence includes the following:

- USCI Pricing included ~ $10,000 for wind rod replacement (Exh "C", p. 3)

**Page 5**

- USCI recommended replacement of 3 to 5 wind rods
- USCI's Service Request to TankEZ required them to "Replace 3-5 Wind Rods" (Exh "D", p. 5)



**Subcontractor's Testimony.** USCI's subcontractor was TankEZ Coatings, Inc.

TankEZ's owner, **Antonio Landaverde**, testified (depo page references in parentheses):

- This was the worst tank he had ever seen (p. 34)
- He told USCI about corroded wind rods on the telephone (p. 47)
- He told USCI's on site inspector about corroded wind rods (pp. 32, 131)
- He e-mailed USCI about corroded wind rods (Exh "I", p. 3)
- USCI told TankEZ to paint over the corroded wind rods (pp. 34, 82, 132)

**USCI's "Thorough" Inspection.** USCI performed its contractually required "thorough inspections" post-renovation (pre-collapse) on June 5, 2015, and April 20, 2016.

Both Reports state: "Wind Rods: No deficiencies…" (Exh "E", p. 6; Exh "F", p. 5):

> ■ Wind Rods: No deficiencies noted with wind rods.

The photographs below depict the horrific condition of typical wind rods from the collapsed water tower—conditions that certainly existed and were disregarded in 2015 and 2016 (Exh "G"):

**Page 6**



**DILAPIDATED WIND ROD**



**DILAPIDATED WIND ROD CLEVIS**

**Engineering Expert.** Attachment "G" is the Affidavit of Travis Wells, PE (including his CV and Rule 26 Report)—Lancaster's retained engineering expert. Engineer Wells explains that wind rods provide lateral stability for the tank structure. (Exh "G", p. 2 – 3). These wind rods and other structural components, were wholly inadequate to provide the intended and necessary for stability and support of the water tower. *Id*. Plaintiffs' engineering expert further explains:

- the critical role of wind rods on the water tower structure (p. 2)
- dilapidated condition of the wind rods and other components (p. 2 – 3)
- need for replacement of wind rods and other components (p. 2 – 3)
- the water tower would have survived the wind forces if the wind rods and other structural components of the water tower were replaced or repaired (p. 2)
- impropriety of the inspections of the water tower (p. 2)
- impropriety of the renovation work on the water tower project (p. 2 – 3)
- the water tower collapsed due to wind forces acting upon the degraded and weakened water tower structure (p. 2)
- The tank contained over 480,000 gallons of water at the time of collapse (p. 7)

- American Water Works Association (AWWA) guidelines promote safety and structural integrity of water tower and tank structures (p. 2)
- AWWA guidelines were not followed by USCI (p. 2)
- Had AWWA guidelines been followed the water tower would not have collapsed (p. 2)
- the structural integrity of the water tower was compromised due to corroded support members that should not have been replaced, and but for such failure to replace the water tower would not have collapsed (p. 3)
- other visual examples of corroded structural members are set forth in the Affidavit, including a corroded clevis attachment and an edge from a missing clevis that was painted over in 2015  (p.4):




## II.   **Evidence Precluding Summary Judgment.**

Lancaster incorporates Plaintiffs' Response to TankEZ's motion for summary judgment (Doc. 48).

The following Attachments to this Response also are incorporated by reference:

**"A":   Transcript of USCI Presentation to the City of Aransas Pass (Px109).**
**"B":   USCI Contract with the City of Aransas Pass (Px003).**
**"C":   USCI Pricing (2013) (Px004)**
**"D":   USCI Service Request (2013) (Px027)**
**"E":   USCI Condition Assessment Report (June 9, 2015) (Px011)**
**"F":   USCI Condition Assessment Report (April 20, 2016) (Px012)**
**"G":   Affidavit of Travis Wells together with his report and CV(04/03/2019) (Px107)**
**"H":   Business Records Affidavit of Mary Juarez (04/01/2019)**

63757_1

    **"I":**    **TankEZ e-mail to USCI (Px049)**
    **"J":**    **Jimmy Asher (USCI) deposition excerpts**
    **"K":**    **Antonio Landaverde (TankEZ) deposition excerpts**
    **"L":**    **Affidavit of Fernando Quintanilla and attached SCADA chart**

## III.   <u>Legal Analysis</u>.

### A.   **Summary judgment standards.**

Summary judgment is proper when the movant shows there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Star Fin. Services, Inc. v. Cardtronics USA, Inc.*, 882 F.3d 176, 179 (5th Cir. 2018). In reviewing the summary judgment motion, the court must refrain from making credibility determinations or weighing the evidence, must view the facts in the light most favorable to the non-movant, and must draw all reasonable inferences in favor of the non-movant.  *Id.*; *Butts v. Martin*, 877 F.3d 571, 582 (5th Cir. 2017).

### B.   **USCI owes a duty to Plaintiffs.**

#### 1.   **USCI owed a duty to all persons—including Plaintiffs—not to injure them or their property in the performance of its contract with the City of Aransas Pass.**

USCI opens its duty argument with an assertion that Plaintiffs are not parties to nor third-party beneficiaries of USCI's contract with the City of Aransas Pass.  Motion at 7-8. That is true but immaterial to the duty analysis.  As the Texas Supreme Court has said, "a party [cannot] avoid tort liability to the world simply by entering into a contract with one party . . . ."  *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014).  To the contrary, "the negligent performance of a contract that proximately injures a non-contracting party's property or person states a negligence claim" under Texas law.  *Id.* at 717.

**Page 9**

Texas law is settled and clear: "One who undertakes to perform a contract assumes a duty to all persons to take reasonable care not to injure them or their property in the performance of that contract, and one who is not privy to the contract may assert a claim for negligence for breach of that duty."  *City of Alton v. Sharyland Water Supply Corp.*, 402 S.W.3d 867, 880 (Tex. App.—Corpus Christi 2013, pet. denied) (quoting *Goose Creek Consol. Indep. Sch. Dist. of Chambers and Harris Ctys., Tex. v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 494 (Tex. App.—Texarkana 2002, pet. denied)).   "[A] contractor performing repairs has an independent duty under Texas tort law not to injure bystanders by its activities, or by premises conditions it leaves behind."  *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2015).   "The contractor's duties are thus tied not only to its control of the premises but also to the quality of its contracted work.  This latter duty may be judged under ordinary-negligence principles even after the contractor no longer controls the premises."  *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 647 (Tex. 2016).

USCI owed an independent duty to use reasonable care not to injure Plaintiffs or their property.  *Chapman Custom Homes*, 445 S.W.3d at 718-19; *In re Weekley Homes*, 180 S.W.3d at 132; *Zbranek Custom Homes Ltd. v. Allbaugh*, No. 03-14-00131-CV, 2015 WL 9436630, at *2-3 (Tex. App.—Austin Dec. 23, 2015, pet, denied); *City of Alton*, 402 S.W.3d at 880; *Goose Creek*, 74 S.W.3d at 494.  USCI's duty does not depend on—and is not analyzed as—an undertaking theory under section 324A of the Restatement (Second) of Torts.  *See id*.  USCI's duty is "tied . . . to the quality of its contracted work," and USCI's compliance with its duty obligation "may be judged under ordinary-negligence principles." *Occidental Chem.*, 478 S.W.3d at 647.

**Page 10**

This case is controlled by *City of Alton, Goose Creek, Zbranek*, and numerous similar cases.

> It is not disputed there was no contract between [USCI] and [Plaintiffs], and there is no contention [Plaintiffs were] made a third-party beneficiary to the contract that did exist between [the City of Aransas Pass] and [USCI]. Although [Plaintiffs] could not raise a claim based on the duties imposed on [USCI] under that contract, [Plaintiffs can] assert a claim against [USCI] based on a breach of [USCI's] duty to all persons to use reasonable care not to injure persons or property in the performance of the contract.

*Goose Creek*, 74 S.W.3d at 494.

> In this case, the [City/USCI] contract imposed a contractual duty on [USCI] to perform services for [the City] . . . .  At the same time, in undertaking to perform its contract with [the City], [USCI] had an independent duty to take reasonable care not to injure [Plaintiffs'] property—not to negligently damage [Plaintiffs' building, business, and property].

*City of Alton*, 402 S.W.3d at 880.

## 2. USCI also owed a duty under section 324A of the Restatement (Second) of Torts.

USCI's duty not to negligently injure Plaintiffs or their property does not depend upon proof of the elements identified in Restatement (Second) of Torts section 324A. Nonetheless, USCI separately owes a duty to Plaintiffs under that section.

Adopting Restatement section 324A, the Texas Supreme Court has "recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 937-38 (Tex. 2000). Specifically, USCI can be liable to Plaintiffs if (1) USCI undertook to perform services that it knew or should have known were necessary for the protection of Plaintiffs and their property; (2) USCI failed to exercise reasonable care in

**Page 11**

performing those services; and (3) the City or Plaintiffs relied upon USCI's performance. *Id*. at 838; RESTATEMENT (SECOND) OF TORTS § 324A.  These are fact questions for the jury. *See Torrington*, 46 S.W.3d at 838.

>  a.  **USCI knew or should have known that its inspection, repair and maintenance of the water tower was necessary for Plaintiffs' protection.**

USCI asserts first that there is no evidence that it undertook to render services for the City that it should have recognized as necessary for the protection of a third person or his things.  Motion at 9. But there is much such evidence, more than enough to overcome summary judgment.

When USCI approached the City in 2013, seeking to obtain a contract for repair and maintenance of the water tower, USCI knew that the City Council had previously approved a $2 million bond sale for the purpose of replacing the water tower.  (Exh "A", pp. 2-3). Following multiple inspections of the water tower, however, USCI assured the City that there was "really not anything wrong" with the water tower "from a structural standpoint." (Exh "A" p. 22). Based upon USCI's inspections and assurances, the City was persuaded not to replace the tower, but to instead contract with USCI for repair and ongoing maintenance of the tower.  *Id*. at 3, 22. The City signed USCI's contract on the same day following USCI's presentation. (Exh "B", p. 6). Thereafter, in accordance with its representations and contract, USCI took on responsibility for inspecting, repairing and maintaining the water tower, including all of its steel parts, in a sound condition in compliance with AWWA standards. (Exh "A", p. 23 – 24; Exh "B", pp. 2 – 3). And USCI again "thoroughly inspected" the water tower in June 2015 and April 2016, notified the

City of no structural deficiency, and affirmatively represented, "Wind Rods: No deficiencies." Exh "D", p. 6; Exh "E", p. 5).

One who undertakes to inspect, repair and maintain a 500,000 gallon water tower standing some 140 feet high "from a structural standpoint" knows or should know that the structural soundness and integrity of that water tower is necessary for the protection of persons and property in the immediate vicinity of that structure. *See State v. $11,014.00*, 820 S.W.2d 783, 785 (Tex. 1991) ("Any ultimate fact may be proved by circumstantial evidence."); *Bujnoch v. Nat'l Oilwell Varco, L.P.*, 542 S.W.3d 2, 10 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (one who undertook to secure a load of mud could foresee that failure to properly secure the load could cause harm to another motorist).

USCI's only argument is that it disclaimed liability for an "act of God" in its contract with the City. *See* Motion at 9 – 10. USCI's contract does include a defined list of "Excluded Items," which states in part that the "Contract does NOT include the cost for and/or liability on the part of the Company for: . . . other conditions which are beyond the Owner's and Company's control, including, but not limited to: acts of God and acts of terrorism." (Exh. "B", p. 3, § 6.  Notably, however, the Excluded Items section does not exclude USCI's liability for its failure to inspect, repair, and maintain the structural integrity of the water tower in accordance with AWWA standards. *Id*. To the contrary, USCI's contract obligated it to inspect, repair and maintain the water tower in a structurally sound condition, (Exh "B", pp. 1-2, § 1), and USCI assured the City it was "able to determine the condition of the tank and what needs to happen to bring it to, like, new condition." (Exh "A", p. 5). USCI's failure to inspect, repair and maintain the water tower

**Page 13**

in a structurally sound condition was not beyond its control and was not due to any act of God.

Under Texas law "[a]n occurrence is caused by an act of God if it is caused directly and exclusively by the violence of nature, without human intervention or cause, and could not have been prevented by reasonable foresight or care." Comm. on Pattern Jury Charges, State Bar of Tex., TEXAS PATTERN JURY CHARGES GENERAL NEGLIGENCE INTENTIONAL PERSONAL TORTS & WORKERS' COMPENSATION PJC 3.5 (2018); *accord Scott v. Atchison T. & S. F. Ry. Co*., 572 S.W.2d 273, 279 n.9 (Tex. 1978). Because there is evidence that the water tower collapse could have been prevented by USCI's reasonable foresight and care; the contractual exclusion for conditions caused by an Act of God does not apply. (*See* Exh "G"). USCI's exclusion of liability for acts of God does not conclusively establish that USCI should *not* have known that its services in inspecting, repairing and maintaining the 500,000 gallon 140 foot high water tower were necessary for the protection of persons and property in the immediate vicinity of the water tower.

USCI represented that it had taken care of water tanks "since the 1960s," that it is "the largest provider of contract tank maintenance in the United States," it presently "take[s] care of over 5000 tanks," and it "inspect[s] about 8,000 tanks [annually]." (Exh "A", pp. 3-4). USCI said it had "been both in the rehabilitation side of the business and we've also worked on the new -- building of new tanks, too." *Id*. at 3. USCI told the City that "typically . . . it's almost always a better fit to be able to rehab a tank," but it expressly cautioned "there are some things that we need to look at first to determine whether or not

**Page 14**

that is – that's the case in [the City's] situation." *Id*. at 3.  Then it assured the City, "So we've done that." *Id*.

USCI assured the City that it had examined "the condition of each one of these tanks [including the elevated water tower], both the inside, outside, top, bottom, all the different aspects of the tank." *Id*. at 3-4.  And USCI promised it would "be able to take care of the problems that we see today [and] also put a system in place so the tanks will be preventatively taken care of from this point forward." *Id*. at 4.

USCI said, "We are confident enough that we can rehab the tank that, again, we're not only willing to perform the job but we're willing to stand behind it. We feel very confident that from a structural standpoint, that there's really not anything wrong with that tank." *Id*. at 22.   USCI told the City, "when we really get into the safety, sanitary, structural, security and coating conditions of a tank . . . we can really look at this stuff and be able to determine the condition of the tank and what needs to happen to bring it to, like, new condition." *Id*. at 4-5. USCI explained "[t]he concept of [its] asset management program is that [the City] contract[s] directly with a qualified tank maintenance provider to evaluate, plan and provide all maintenance and repairs on an on-going basis." *Id*. at 6. USCI assured the City that "a water tower will literally last forever if it's proactively maintained . . ." *Id*. at 7.  USCI said:  "Once we have a contract signed on that tank, when we go and we paint the tank, we repair the tank, we do any of the work on the tank, we are going to stand behind it for the perpetual, for the full service life of the coating system. Same thing with any of the repairs.  . . . . [W]hen we come to repair the tank, when we come to inspect the tank, we're looking at it like we own the tank." *Id*. at 18.

**Page 15**

USCI promised "we have a scope of work that we know what we need to do to bring this up to State of Texas, to American Water Works Association and to OSHA. And once we do that scope of work, you'll be in compliance with all these organizations. If it takes additional work in order for us to get you compliant with all these organizations, then that's additional work that we have to do. But again, it doesn't change the fact that we have to keep in compliance and we have -- we have -- number one -- you know, sole source responsibility of the tanks." *Id*. 23-24.

USCI's representations concerning its experience and capabilities, the structural integrity of the water tower, its "thorough inspection" and its ongoing maintenance and repair obligations are evidence that USCI knew or should have known that its undertaking to repair, rehabilitate, and maintain the water tower in a structurally sound fashion was necessary for the protection of persons and property in the immediate vicinity of a tower collapse.

### b.    USCI does not challenge its failure to exercise reasonable care.

USCI does not challenge Plaintiffs' ability to meet the second element nor does it allege any absence of evidence that it failed to exercise reasonable care in performing its services. *See* Motion at 7-15. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *accord Little v. Liquid*

*Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Because USCI has not challenged this element, summary judgment on this ground would be improper.  *Little*, 37 F.3d at 1075.

### c.    The City relied on USCI's performance.

Standing alone, the evidence that the City abandoned its plan to replace the water tower and instead contracted with USCI to inspect, rehabilitate, repair, and maintain the water tower is sufficient evidence of reliance.  *See* RESTATEMENT (SECOND) OF TORTS § 324A cmt. e; *see also Canipe v. Nat'l Loss Control Serv. Corp.*, 736 F.2d 1055, 1063-64 (5th Cir. 1984) (reliance element is satisfied when one "neglect[s] or reduce[s] its own safety program"). The City abandoned its plan to replace the water tower after USCI assured the City that it could examine the structural condition and safety of the tower and "determine the condition of the tank and what needs to happen to bring it to, like, new condition."  (Exh "A", pp. 4-5). Based upon its inspections, USCI assured the City that it was "very confident that from a structural standpoint . . . there's really not anything wrong with that tank." *Id*. at 22. USCI's assurances—made to the entire Aransas Pass City Council in an open meeting—resulted in the City's acceptance of USCI's contract. (Exh "A", p. 26 – 27; Exh "B"). Thereafter the City continued to rely on USCI's "thorough inspections" and its representations of no wind rod deficiencies or other structural integrity issues. (Exh "B"; Exh "E"; Exh "F").

USCI again argues that the City could not rely on its representations because the contract excluded acts of God. But USCI's exclusion of liability for acts of God does not conclusively negate the City's reliance on USCI's contractual agreement to inspect, repair and maintain the structural integrity of the water tower.  *See* section III.B.2.a. above.

**Page 17**

USCI also argues that its "general and broad descriptions of the nature of its services cannot replace the actual undertaking." Motion at 15. USCI ignores that "[w]hen, as here the facts about the scope of the assumed duty are in dispute, the jury should be instructed to that effect." *Torrington*, 46 S.W.3d at 839.  USCI's argument is not a basis for summary judgment.

Moreover, the Texas Supreme Court has repeatedly held that "[a] written contract must be construed to give effect to the parties intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol evidence rule."  *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890,984 (Tex. 2017) (quoting *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)). The parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Id*.  Those surrounding circumstances include "the commercial or other setting in which the contract was negotiated and other objectivity determinable factors that give a context to the transaction between the parties." *Id*. (quoting 11 Richard A. Lord, *Williston on Contracts* § 32.7 (4th ed. 1999)).  And the court has recognized that "[n]egotiations of the parties may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole."  *Houston Expl.*, 352 S.W.3d at 469-70.

USCI's assurances—(1) it was "confident that from a structural standpoint, that there's really not anything wrong with" the water tower; (2) it was "not only willing to perform the [rehabilitation] job but we're willing to stand behind it;" (3) it "kn[e]w what we need to do to bring [the water tower] up to State of Texas [and] American Water Works

**Page 18**

Association [standards];" (4) the City would "be in compliance" with these standards; (5) if additional work were required to keep the City in compliance, "then that's additional work that [USCI has] to do;" and (6) the City would "have single source responsibility" for repair and maintenance of the water tower in USCI—do not contradict the contract text and are appropriately considered in interpreting the contract's text.

Plaintiffs have evidence of reliance on USCI's undertaking.

### d. The *Knife River* case does not resolve USCI's duty under section 324A.

USCI argues the analysis in *Knife River Corporation-South v. Hinojosa*, 438 S.W.3d 625 (Tex. App—Houston [1st Dist.] 2014, pet. denied) supports USCI's no-duty claim. But *Knife River* involved different duty allegations than those involved here.

Section 324A recognizes a duty in three distinct situations. "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for the physical harm resulting from his failure to exercise reasonable care to protect his undertaking" if any one of three separate alternatives is shown:

(a)     his failure to exercise reasonable care increase the risk of harm, *or*

(b)     he has undertaken a duty owed by the other to the third person, *or*

(c)     the harm is suffered because of reliance upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A (emphasis added). Thus, a plaintiff may establish a duty and liability by proving any one of the three alternatives. *Id*.

**Page 19**

The plaintiff in *Knife River* contended that Knife River owed a duty "because, as defined in Section 324A subpart (a), Knife River increased a risk of harm to [the plaintiff] Hinojosa and, as stated in subpart (b), it undertook to perform a duty owed by the other to the third person." *Knife River*, 438 S.W.3d at 632. The plaintiff in *Knife River* did not allege the third alternative ground stated in section 324A subpart (c), that "the harm is suffered because of reliance of the other or the third person upon the undertaking." *See* RESTATEMENT (SECOND) OF TORTS § 324A(c); *Knife River*, 438 S.W.3d at 632.

Here, Plaintiffs rely upon subpart (c) of section 324A and have evidence that Plaintiffs' harm, the damage to their property and business, was suffered because of the City's reliance on USCI's undertaking. *See* section III.B.2.c. above. USCI undertook to inspect the water tower; assured the City that the water tower could be repaired and rehabilitated, rather than replaced; assured the City "that from a structural standpoint, that there's really not anything wrong with that [water tower];" assured the City that it would "take care of the problems that we see today" and "put a system in place so the tanks will be preventatively taken care of from this point forward;" and assured the City that it would do the work necessary to bring the water tower into compliance and remain in compliance with American Waterworks Association standards.  (Exh "A", pp. 3-4, 22-24). In reliance on those assurances, the City signed a Maintenance Contract with USCI, instead of moving forward with its previously approved bond sale of $2 million which would have replaced the water tower, paid USCI substantial sums, and every year thereafter accepted USCI's representations that its "thorough inspection" had identified no deficiency. (Exh "A", pp. 2, 22; Exh "B", pp. 1 – 2; Exh "E"; Exh "F").

**Page 20**

In its contract, USCI accepted the water tower "based upon its existing structure and components." (Exh "B", p. 3 § 4). USCI promised to "furnish engineering and inspection services needed to maintain and repair the tank and tower during the term of [the] Contract." *Id*. at p. 3, § 1.C. USCI promised "[t]he tank and tower [would] be thoroughly inspected to ensure the structure is in a sound, watertight condition. *Id*. at p. 2, § 1.A.  The City signed USCI's contract on May 21, 2013. *Id*. at p. 6.  The contract remained in effect, with the City paying substantial fees, when the tower collapsed in August, 2017. *Id*. at p. 2, § 2.

USCI's potential negligence liability under these facts is clear. In describing an actor's liability under subpart (c) of section 324A, the Restatement provides an illustration mirroring the facts of this case.  The Restatement explains:

> *Reliance*. The actor is also subject to liability to a third person where the harm is suffered because of the reliance of the other for whom he undertakes to render the services, or of the third person himself, upon his undertaking. This is true whether or not the negligence of the actor has created any new risk or increased an existing one. Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk.

RESTATEMENT (SECOND) OF TORTS § 324A, cmt. e.

The Restatement authors then provide the following illustration:

> A Company employs B Company to inspect the elevator in its office building. B Company sends a workman, who makes a negligent inspection and reports that the elevator is in good condition. Due to defects in the elevator, which a proper inspection would have disclosed, the elevator falls and injuries C, a workman employed by A Company. B Company is subject to liability to C.

*Id*. at illus. 4.

**Page 21**

USCI is equally subject to liability to Plaintiffs.

In the *Knife River* case, "representatives from Knife River and TxDOT made clear that neither party to the contract intended to impose a duty on Knife River to rectify the drop off." *Knife River*, 438 S.W.3d at 635.  In the *Knife River* case "it was not in dispute that TxDOT knew that a 3:1 gradient could not be achieved at any of the box culvert locations." *Id.*

No such evidence exists in this case. USCI identifies no testimony from the City that the City did not intend and rely upon USCI to inspect, repair, and maintain the water tower in a structurally sound condition in accordance with AWWA standards, just as USCI represented it would do. Likewise, in this case there is no evidence that the City knew USCI had not repaired and was not maintaining the water tower in a structurally sound condition in accordance with AWWA standards. *Knife River* does not support summary judgment in this case.

**C.    USCI's negligence proximately caused Plaintiffs' injuries.**

As its second ground for summary judgment, USCI asserts that Plaintiffs have no evidence that USCI's negligence proximately caused damage to Plaintiffs' property. Motion at 15-19. Specifically, USCI first challenges the basis for Plaintiffs' expert's opinion that the water tower would have been able to withstand the winds associated with Hurricane Harvey had USCI exercised ordinary care in its inspection, repair and maintenance work on the tower.  *Id.* at 15-17. Secondly, USCI challenges the basis for Plaintiffs' expert's opinion that water released from the collapsed water tower caused Plaintiffs' property damage. *Id.* at 17-19.

Plaintiffs first note that no *Daubert* challenges were filed against Plaintiffs' experts, and that deadline has long passed (February 4, 2019, *see* Doc 17). Because USCI did not timely challenge Plaintiffs' engineering expert, USCI should not now be heard to complain about any alleged methodological or other deficiencies in the expert's opinions. Because there is at least some evidence that USCI's negligence proximately caused Plaintiffs' damages, USCI's motion for summary judgment should be denied.

In seeking summary judgment, USCI neglects to mention several controlling legal principles.  First, Texas law is clear that there may be more than one proximate cause of an event or injury.  *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).  "More than one action may be the proximate cause of the same injury."  *Wilson v. Brister*, 982 S.W.2d 42, 44 (Tex. App—Houston [1st Dist.] 1998, pet. denied).   "There can be concurrent proximate causes of an [event]" and "[a]ll persons whose negligent conduct contributes to the injury, proximately causing the injury, are liable."  *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).  Further, "[w]here the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit."  *Landers v. E. Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952).

"The intervention of an unforeseen and unexpected cause is not sufficient to release a wrongdoer from the consequences of his negligence if that negligence directly and proximately 'cooperates' with the independent cause in the resulting injury."  *Gannett*

**Page 23**

*Outdoor Co. of Tex. v. Kubeczka*, 710 S.W.2d 79, 85 (Tex. App.—Houston [14th Dist.] 1986, no writ).  "[F]or a defendant to be relieved of liability for an unprecedented flood, there must be no negligence of the defendant concurring with the act of God to cause the damage resulting." *Luther Transfer & Storage, Inc. v. Walton*, 296 S.W.2d 750, 753 (Tex. 1956).

USCI does not challenge the overwhelming evidence of its failure to exercise ordinary care to properly inspect, maintain, and repair the water tower in accordance with AWWA standards in advance of the hurricane.  Nonetheless, USCI asserts that Plaintiffs have no evidence that its negligence in inspecting, repairing and maintaining the water tower contributed to cause the tower's collapse. That assertion should be summarily rejected.

"[P]roximate cause may be established by direct or circumstantial evidence and the reasonable inferences that may be drawn from that evidence."  *Benson v. Chalk*, 536 S.W.3d 886, 902 (Tex. App—Houston [1st Dist.] 2017, pet. denied).  A "plaintiff need not exclude all possibility that the accident occurred other than how he alleges, but instead must only prove the greater probability is that the defendant's conduct was a cause of the accident." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex. 1987).  "Under Texas law, '[l]ay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Hamburger v. State Farm Mut. Ins. Co.*, 381 F.3d 875, 884 (5th Cir. 2004).

**Page 24**

Plaintiffs' engineering expert has offered a sufficient basis for his opinion that the water tower would have been able to withstand the winds associated with Hurricane Harvey had USCI exercised reasonable care in its inspection, repair, and maintenance work on the water tower.  First, before its condition deteriorated, this water tower remained upright and structurally sound during the stronger winds associated with Hurricane Celia.  (Exh "G", p. 3 & report pp. 5, 16-17). A jury can reasonably infer that, but for USCI's failure to repair and maintain the water tower in "like new" condition, the water tower would not have collapsed in Hurricane Harvey, just as it did not collapse in Hurricane Celia. *See Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 889 (Tex. App.—Texarkana 2004, pet. denied) ("[L]ike any other ultimate fact, proximate cause may be established by direct or circumstantial evidence and the reasonable inferences that may be drawn from that evidence.").

Additionally Plaintiffs' engineering expert has explained that:

Wind rods (including their connecting plates) are critical structural members of a water tower support structure. They are not redundant. Each wind rod provides resistance to a single structural frame and in single direction for wind loading. The loss of even a single wind rod will subject that frame and its surrounding frames to higher loads and loading directions they were not designed to withstand. Without all wind rods properly adjusted and able to withstand the forces for which they were designed, the water tower structure becomes highly susceptible to buckling---even during wind events below those for which it was designed.

(*See* Exh "G", pp. 2 – 3).

Further Plaintiffs' engineering experts:

examined actual artifacts including wind rods and clevises, and dozens of photographs of other structural members (including other wind rods, clevises, and connecting plates) and found the structural condition of the

**Page 25**

> water tower support system to be in a state of disrepair. The material loss we measured on the artifacts confirmed the severity of their conditions as the ability to withstand loads for some of the components had been reduced by as much as 52-87%. Our opinions that the subject water tower structural components were in a state of disrepair are corroborated both by the testimony of Mr. Landaverde (TankEZ) that the water tower was in the worst condition of any he had ever seen, and USCI's own statements to the City of Aransas Pass that "several wind rods and also several riser rods ... need conditioning ... [and are] getting to the point of being structurally unsafe." Nonetheless USCI did not replace any of the wind or riser rods.

(*See* Exh "G", p. 3).

Plaintiffs' engineering experts have also explained why the inability (of anyone) to examine every wind rod after the tower collapsed does not negate the experts' ability to opine on causation:

> Our engineering analysis is not compromised by the unavailability of all water tower components. There has been no indication from the discovery materials provided by USCI that they were able to determine that the unavailable Wind Rods were all in good shape; the testimony and evidence suggests otherwise.

(*See* Exh "G", p. 5). *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (admissibility of an expert's opinion does not "depend[] upon the expert disproving or discrediting every possible cause other than the one espoused by him.")

Consequently, Plaintiffs' expert reasonably concludes:

> The 2015 renovation of the water tower should have included the replacement of wind rods as per the contract documents as well as others revealed during a proper inspection of the tower structure, and these replacements should have restored the water tower structure to, in the words of USCI, "like new condition."

> The water tower would have survived the wind forces of Hurricane Harvey if the integrity of the water tower structure had been properly rehabilitated. This is evident by the severity of damage in Aransas Pass observed by Haag and other inspectors, which was described as "minor" to newer houses. It is

**Page 26**

also evident by the severity of material loss due to the extreme degree of corrosion we measured. It is also evident by the fact that the water tower had previously withstood the greater wind pressures of Hurricane Celia without damage.

It is undeniable that the structural integrity of the water tower was compromised due to corroded support members that should not have been painted over without replacement. This fact is evident, as outlined above, but for such failure to replace the degraded water tower components, the water tower would not have collapsed.

(*See* Exh "G", p. 3).

The opinion of Plaintiffs' engineering expert that water from the collapsed tower (alone or in cooperation with other causes) caused Plaintiffs' property damage is likewise amply supported. As the expert explains:

the damage observed to the Lancaster building was isolated to the corner and north side of the building closest to the water tower and nearby buildings and other materials were displaced away from the water tower as shown in the photograph [he references].

When hurricanes approach land, sea levels rise prior to landfall. Surge typically affects seaside communities for some period prior to highest winds. Surge and wave action will damage a structure from the ground level upward to the level of the highest wave action. On the other hand, wind forces are greatest high on structures usually resulting in extensive roof damage well before any structural damage closer to ground level.

In this case, the Lancaster building displayed wall damage from the foundation upward, while the roof was relatively unaffected. We did consider the possibility that surge had caused the damage; however, wall panels were only damaged in places corresponding to water flow from the collapsed tank and their displacement was in the direction of water flowing from the tower. Wall panels away from [where] the tank fell were undamaged. This was clear evidence that the damage was not surge related because surge would have affected the entire perimeter of the building. Surge would not have affected only the areas of the building that were nearest to the tower would not have caused nearby materials to displace in directions away from a point at the location of the tower collapse.

(*See* Exh "G", pp. 6 – 7).

Additionally, general experience and common sense enable a layman to determine that the collapse of a 140 foot water tower and consequent release of more than 480,000 gallons of water would cause damage to property in the water's path.  (*See* Exh "L"). Plaintiffs' expert agrees. (*See* Exh "G", p. 7).

## PRAYER

Defendant Utility Service Co., Inc.'s Motion for Summary Judgment should be denied. Plaintiffs request a trial by jury on all issues of fact and for all other appropriate relief.

Respectfully submitted,

By:   */s/ S. Scott West*
     S. Scott West
     Federal Bar No. 12156
     State Bar No. 21206920
     scott@westfirm.com

THE WEST LAW FIRM
1600 Highway 6, Suite 450
Sugarland, Texas 77478
281.277.1500–telephone
281.277.1505–facsimile

By:   */s/ Richard P. Hogan, Jr.*
     Richard P. Hogan, Jr.
     Federal Bar No. 8026
     State Bar No. 09802010
     rhogan@hoganfirm.com
     Jennifer Bruch Hogan
     Federal Bar No. 7187
     State Bar No. 03239100
     jhogan@hoganfirm.com

HOGAN & HOGAN
711 Louisiana, Suite 500
Houston, Texas 77002
713.222.8800–telephone
713.222.8810–facsimile

63757_1

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court's ECF system and was served via electronic means through transmission facilities from the Court upon those parties authorized to participate and access the Electronic Filing System for the Southern District of Texas.

Counsel for Defendant
Utility Service Co., Inc.:

Vaughan Eugene Waters
Thornton, Biechlin,
Reynolds And Guerra, L.C.
100 N.E. Loop 410, Suite 500
San Antonio, Texas 78216

Counsel for Defendant
TankEZ Coatings, Inc.:

Bryan Douglas Wendt
Burt Barr & Associates
203 E. Colorado Blvd
Dallas, Texas 75203

*/s/ S. Scott West*
S. Scott West
Dated: April 3, 2019

63757_1